[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff husband commenced this action for a dissolution of the parties' marriage by complaint returnable February 13, 1990. He alleges that the marriage has broken down irretrievably and seeks such other relief as is fair and equitable. The defendant wife denied in her answer that the marriage had broken down irretrievably, but `conceded that the court may so find in view of the plaintiff's allegation of irretrievable breakdown.' In her cross complaint, she made no affirmative allegations of cause for the legal ending of a marriage as provided in General Statutes 46b-40b, but claimed a legal separation, alimony, an assignment of the plaintiff's interest in certain real and personal property, attorney's fees and other relief. In her proposed claims for relief, however, she now seeks a dissolution of the marriage; the court deems this to effectively amend this claim for relief. Both parties were represented by counsel throughout the proceedings, CT Page 3909 including trial.
At the hearing, the parties testified, filed financial affidavits, submitted proposed written claims for relief and introduced a large number of documentary materials into evidence. These included tax returns, trust instruments, check registers and records, deeds, and appraisal reports. In addition, each party called witnesses, and the hearing consumed several trial days. The hearing was concluded on March 9, 1994, and the parties made oral argument and filed simultaneous post-trial briefs. The parties also reserved the right, upon request, to additional argument after the briefs, and reply briefs, if any, were filed. Reply briefs were not filed and additional argument was not requested. From the evidence, the court finds as follows.
The plaintiff husband married the defendant wife, whose birth name was Sandra Potter, on July 7, 1962, at New Haven, Connecticut. He has resided continuously in this state for at least one year before the date of the complaint, January 16, 1990. All statutory stays have expired and the court has jurisdiction. The parties have three children, all of whom have reached their majority and are issue of the marriage. No other minor children were born to the wife since the date of the marriage, and neither party is a recipient of public assistance.
The plaintiff husband is 57 years of age, is a high school graduate with one year of college, and is in good health, except for bronchitis and a gall bladder operation, which do not appear to affect or impair his ability to work. He worked as a draftsman for about a year and one half, and except for a four year stint in the military worked in his family business founded by his father Martin Olson, now deceased. He now serves as President of Mall, Inc., (Mall) a Connecticut corporation, whose outstanding and issued common stock is almost wholly owned by the Martin Olson Revocable Trust (MORT). The plaintiff owns one share of Mall which is equivalent to a one ten-thousandth interest (0.01%) in all of the issued and outstanding stock of the corporation.[1] The plaintiff also serves as co-trustee of the Martin Olson irrevocable Trust (MOIT) and (MORT). MORT owns the fee interest in a retail shopping center (Groton Shopping Center), which is leased to Mall, who in turn, leases space to a large number of retail tenants; Mall owns the fee interest in the CT Page 3910 Olde Mystick Village shopping center, which is leased to MOIT, which in turn, leases space to an even larger group of retail tenants. The plaintiff's sister, Joyce Resnikoff is the `primary' trustee of each trust, and the `de facto' chief operating officer and secretary-treasurer of Mall.
In his capacities as president of Mall and co-trustee of the trusts, he has been mainly involved in maintenance and public relations with respect to the operation of the trust properties, while the primary trustee has had the overall responsibility for all financial matters, management and leasing. The plaintiff has also taken real estate courses and holds a current Connecticut real estate broker's license.
In 1993, the plaintiff earned $108,000 as president of Mall, $83,200 as co-trustee of MOIT,[2] $3,000 from director's fees of Mall, and a declared, but unpaid trust income distribution of $30,000. He also reports about $8,000 in investment income, for a total annual gross income of $232,200 in 1993. In prior years, his total gross income, from all sources, as reported on the individual federal tax returns has been: 1992, $229,327; 1991, $245,711; 1990, $218,091; and 1989, $223,422. These amounts do not include principal distributions from the trusts. The plaintiff is also furnished as a perquisite from Mall, a 1990 Corvette motor vehicle,[3] and as additional benefits, fully paid life and health insurance.
The defendant wife is 53 years of age, and will be 54 in May, 1994. She is a college graduate and taught second grade in a public elementary school for about six months, and left her job when she became pregnant with the parties' first child. Aside from that employment, she has only worked outside of the home for a short period of time in a nephew's retail store as a store clerk. She has not kept up with the teaching field, and is not licensed or certified to teach in a public school in this state. There is no indication that she can obtain the additional education and training to be able to do so, considering her age, health and abilities, and lack of willingness. She has suffered from ulcerative colitis since about 1988, and has undergone several colonoscopies, and anticipates further testing in the near future. Her condition causes diarrhea, nausea and rectal bleeding. Her symptoms appear periodically, and generally are aggravated with stress; she takes medication daily and has a restricted diet. She also has painful heel spurs, which have required cortisone CT Page 3911 injections, and she has difficulty in standing for long periods of time. She is being treated by a psychiatrist, and takes medication to help her sleep. Despite these health problems, she is able to regularly do a significant amount of volunteer work, mostly associated with her church. This includes arranging of funerals and weddings, office work, decorations for holidays and work in the church thrift shop. She also does some volunteer work at the local hospital guiding a lobby cart, and selling magazines, newspapers, etc. She is also able to drive, shop, prepare meals and do most ordinary household chores. Considering her lack of vocational and technical skills, even though she appears to have considerable organizational skills, she has a minimal earning capacity at best, in the light of her age, health and the realities of the job market.
The wife has been the primary homemaker and child caretaker throughout the parties' marriage. She has done the lion's share of the cooking, cleaning, housework, shopping, laundry, chauffeuring of the children, and the like.
During the parties' marriage of almost 32 years' duration, they maintained a high, but not lavish or ostentatious, standard of living. The family did not want for food, clothing, or shelter, and was able to enjoy luxuries. The couple was able to travel, including trips abroad; the husband, on occasion, also took trips separately.
Presently, the wife resides in the family home with the parties' youngest son, Todd, age 24, a student. Each parent still assists him, the plaintiff with payment of his car insurance premium; the defendant with room, board and incidentals.
The defendant claims that since the parties have separated, she is unable to enjoy her previous standard of living. In particular, she is unable to afford vacation travel, or save any money for retirement on her pendente lite alimony order of $1,400 per week. Her medical insurance is maintained by the plaintiff, and as stated, the premiums are now paid through his employment, and upon a dissolution, would require provision for their payment.
On the other hand, the plaintiff, who resides with a female companion with whom he established an intimate CT Page 3912 relationship after the parties separated the second time, claims that he runs a substantial shortfall between his income and his expenses. The plaintiff resides in a single-family home owned by his companion, and pays her $800 per month rent, which alone exceeds her mortgage payments, taxes and homeowner's insurance premiums. In addition, he also provides groceries from time to time.
The plaintiff has traveled extensively with her, both in the states and abroad, on pleasure trips, and on trips where business and pleasure were combined. Except for those trips associated with his companion's business, when her individual transportation and hotel expense are paid for by her employer, the plaintiff has paid for everything else. These expenses amounted to about $12,000 for their travels during the past year.[4]
The plaintiff basically claims that the reason the marriage has broken down was because the defendant has always paid more attention to their children than to him. He further claims that the defendant refused to participate in his activities, resisted travel with him and watched too much television. He also asserted that she resisted joining with his family and business associates at family, social, and business functions and gatherings. He believes that she has shown a lack of interest in him, and a lack of affection and respect for him. He describes a total failure of communication between them, and states that they eventually came to have nothing in common.
He consulted a lawyer in late 1989, waited for the holidays, and left the family home in January, 1990, when he instituted this action. He also consulted a minister and psychiatrist. His announcement of his intention to seek a divorce came as a shock to the defendant.
As a result of some persuasion applied to him by the couple's sons, the plaintiff returned home after a short stay in a motel. The parties attempted a reconciliation, but this did not work, and the plaintiff left again in the early summer of 1990, and they have been separated since.
While there may be some truth in the plaintiff's narrative relating to the causes of the marital breakdown, the court finds the wife's testimony more credible. The plaintiff conceded that CT Page 3913 the wife was a wonderful parent and a `great' homemaker, and that she was very active with their children and their immediate family. She was satisfied with their marriage, at least as of 1988 or 1989. There was no apparent discord in the household, and she believed they had a happy home. She cooperated in the pursuit of family goals, and the couple frequently participated together in family-oriented activities with the children. She volunteered to work in the public school system and in church-related activities. She attended business, social and family gatherings with him, and traveled with him when asked, except on one occasion. She is naturally shy and at times did not feel entirely comfortable at some of the business and social gatherings, while he is more outspoken and outgoing, and became more so. She also felt unable to reciprocate the hosting of such gatherings at her home.
The plaintiff's outlook, interests and focuses changed. He became more involved in outside activities. He went to Australia for three weeks on a ballooning trip, without discussion with the defendant before making the trip arrangements. He just believed or assumed she would not want to go. He became involved in public speaking and watched self-improvement videotapes. He obtained a chauffeur's license in 1989 or 1990 to drive `young couples' to New York on pleasure trips. He even acquired a chauffeur's cap. The wife believed that this was inappropriate for his age and station, and that the plaintiff was `fantasizing'. He began to associate with younger men, close to the ages of his sons, and while he complained about his wife's `couch potato' habits, he videotaped 139 TV movies, all of which he watched.
What really happened is that the husband wanted to do more traveling, get more out of his life, see and experiment with other women, and to be free of his marriage. When the parties got back together after the plaintiff left home in January, 1990, the wife exerted herself to revive the marriage, but was unable to do so.
From this evidence and these findings, the court concludes that the marriage has broken down irretrievably, and that a greater share of the responsibility for the breakdown of this long marriage must be borne by the plaintiff.
The parties have accumulated assets of substantial value during the marriage. These include: the jointly-owned CT Page 3914 family home known as No. 250 Mile Creek Road, Old Lyme, Connecticut, which the court values at $318,000, less a mortgage balance of $39,000, leaving an equity of: $ 279,000
Unimproved land in Stonington valued at: 70,000[5]
Unimproved land in Waterford valued at $35,000, less mortgage of $49,993, with negative equity of: — 14,993
Two (2) Corvette Automobiles (a 1962 a 1979) 18,000[6]
Securities valued at: 210,875
Mystic Bank Tr. Certificate of Deposit 2,000
Merrill Lynch IRA account 11,712
MOIT Distribution due for 1993 of $30,000 and uncashed check receivable from MOIT of $12,500 42,500[7]
Promissory note payable from Mall 10,000
Two motor vehicles owned by the wife 6,100
Diamond ring 4,300
Wife's bank accounts 8,351[8]
SNETCO stock 345
One share of Mall, Inc. stock 400[9]
Personal property in the family home 10,000
TOTAL: $658,590
Against these assets, the husband lists a single liability of $49,993[10] on his financial affidavit; the wife lists $38,122 in liabilities, of which $35,000 is her attorney's fee for this litigation. Except for the jointly-owned family home, the wife's motor vehicles, her diamond ring, bank accounts, SNETCO stock, and home furnishings, all of the other items listed above are solely owned by the husband. The North Quincy, Massachusetts condominium unit shown on the wife's affidavit equitably belongs to a son of the parties, and both parties CT Page 3915 agreed on the record that they claim no interest therein. The three unpaid obligations due the husband from the MOIT trust and Mall total $52,500; they and the one share of Mall stock were not included in his financial affidavit, and are very serious omissions.
The assets of the marriage were largely acquired by means of the husband's income from his employment, his investments and trust distributions, and the wife's monetary contributions were minimal or next to nothing. The sole exception is their present home which was purchased in part from the proceeds from the sale of a prior jointly-owned home the parties owned in Clinton, Connecticut. In any event, it is clear that the parties' present asset picture is almost entirely due to the husband's monetary and economic contributions to the marital assets. The court also recognizes, as it must, the defendant's nonmonetary contributions to the marriage of child rearing, caretaking and homemaking, which were also significant. See O'Neill v. O'Neill, 13 Conn. App. 300, cert. denied, 208 Conn. 806 (1988).
The parties consumed a substantial amount of the time involved in this litigation of over four years' duration on issues of discovery related to the valuation and income of the MOIT and MORT trusts and the shopping centers. The plaintiff essentially claimed that with the exception of principal and income distributions actually made to him, all other information pertaining to the trusts was neither discoverable or admissible in evidence, as his interest was a mere expectancy, under the rule of Rubin v. Rubin, 204 Conn. 224, (1987). Rubin held that a spouse's contingent remainder interest in an inter vivos trust was not "property" subject to assignment pursuant to General Statutes 46b-81.
The defendant contended that the valuations of the trusts' assets and extent of the trusts' incomes are both discoverable and admissible, and were relevant to consider the `opportunity of the plaintiff for future acquisition of capital assets and income' in the fixing of the value and nature of the property to be assigned to either spouse pursuant to General Statutes 46b-81 (c). The defendant further claimed that the information already provided by the plaintiff and/or the primary trustee pertaining to the past distributions of income and principal from the trusts was vague, uncertain and inconsistent.[11]
CT Page 3916
The following additional facts pertaining to these claims are found. Both the MOIT and MORT trusts were established by the plaintiff's father, Martin Olson, (settlor) and basically provided that upon his death, and the death of the settlor's wife, the trustees were to pay over to the settlor's issue, including the settlor's children, so much of the income and principal of the trusts as the primary trustee may determine in the exercise of her sole discretion, for their education, comfortable support and maintenance.
Once the primary trustee exercised her discretion to distribute funds, and the amount thereof, then the distribution must be divided into four equal shares (the number of the settlor's children), and the primary trustee and co-trustee (the plaintiff) are required to jointly determine the allocation of each distributive share within each of the four branches of the family. The primary trustee may not distribute principal or income to any one branch of the family without distribution to all.
Both the settlor and his wife are deceased, and the plaintiff is a vested beneficiary of the trusts, and co-trustee of each. He is also the successor primary trustee. The present primary trustee is his sister, Joyce Resnikoff. The plaintiff has a special or limited power of appointment over the appointive assets allocated to his branch of the family, which may be exercised only in favor of his children or issue. The trusts have spendthrift[12] provisions providing that the interest of any beneficiary shall be free from the control or interference of such beneficiary's creditors or spouse, and shall not be subject to attachment, or susceptible to anticipation or alienation.
The plaintiff has received substantial distributions in past years from the trusts. These included a principal distribution of $250,000 from MOIT in 1986 and a principal distribution of $175,000 from MORT in 1988. Additionally, MOIT has declared annual[13] distributions to him since 1985, totaling about $155,000, all of which he has received, excepting the $30,000 for 1993, which has not yet been paid.
In the event the primary trustee determines not to distribute the trust net income to the beneficiaries, then such undistributed income is taxable to the trust, and it has been CT Page 3917 the past practice of the primary trustee to be guided by her accountant, and to distribute such income, at least annually, to avoid such taxation.
From this evidence, the court concludes that the plaintiff's interests in the trusts are far more than a mere expectancy, or an inchoate property interest, and the rule in Rubin, supra, excluding such evidence, does not apply. The court holds that the evidence relating to the trusts' assets and incomes was both discoverable and admissible and relevant to the plaintiff's opportunity to acquire capital assets and income in the future, and the consequent determination of property distribution under 46b-81, and also to allow verification of the information supplied the defendant on the amounts and nature of the previous trust distributions to the plaintiff.
The defendant initially sought by way of relief an assignment of a portion of the plaintiff's interests in the trusts. In her claims for relief filed at trial, she altered her claim to request, as lump sum alimony, an amount equal to one-third of ". . . any principal distribution the plaintiff receives from either MOIT or MORT so long as the defendant remains single."
The court rejects this claim for two reasons. First, by the provisions of the trust instruments themselves, a beneficiary's interest may not be subject to the control or interference of such beneficiary's spouse, and shall not be susceptible of anticipation or alienation, or be subject to attachment. Nor can a spouse of a beneficiary take upon a termination of either trust. Also, divorced spouses of beneficiaries may not take under any provision of either trust. What the defendant suggests is that the court do indirectly, what it may not do directly.
Second, the court concludes that the extremely large principal distribution from each trust were unusual events and were associated with a mortgage refinancing of each shopping center. Given the nature of the trust assets, there was no evidence that such large principal distributions, are likely to recur. Indeed, it is doubtful.
Since this is so, an award of a portion of the plaintiff's future principal distributions may not be justified CT Page 3918 either as a permissible transfer of property under General Statutes 46b-81, or as a lump sum alimony award under46b-82.
Our Supreme Court has stated that `property' in connection with 46b-81 entails "interests that a person has already acquired in specific benefits." Rubin v. Rubin, supra, 230-231. The court further stated, "We agree with the view that the relevance of probable future income in determining the fair and equitable division of existing property . . . does not establish jurisdiction to make allowances from . . . property other than that held at the time." (Internal quotation marks omitted) (Emphasis added.) Id.
Here, although the plaintiff does have a vested interest in the trusts, and probably will receive future distributions, distribution of principal may never recur, and there is no way of knowing what future principal distributions the plaintiff will receive, if any. Such an order may well be illusory and could result in great inequity.
For substantially the same reasons, such an award of contingent lump sum alimony may not be made under these circumstances, and may be viewed as simply an assignment of property, albeit in a different form. Although the court deems it probable, principal distributions from the trust may never be realized. It must be kept in mind that an alimony order, whether periodic or lump sum, is predicated upon the obligation of support that spouses bear to each other which is imposed upon them by virtue of their marriage. While a continuing order of periodic alimony is subject to modification upon a substantial change in circumstances of either party, the lump sum alimony order requested is not. Looking into the future, such an order on these facts has the same infirmities as a contingent property assignment and may be either illusory and of no benefit to the defendant, or unfair in the event of a substantial change in circumstances.
The defendant argues, however, that such an award is justified by Lawlor v. Lawlor, 16 Conn. App. 193; cert. granted,209 Conn. 821 (1988); appeal dismissed, 212 Conn. 117 (1989). In Lawlor, the Appellate Court upheld a periodic alimony order which provided for "automatic cost of living increases . . . based on the payor's projected income and salary". The Supreme Court dismissed the appeal on the ground that certification was CT Page 3919 improvidently granted, noting that ". . . [t]he record does not clearly establish that the trial court's formula for automatic increases in alimony payments is a true cost of living adjustment provision" Id. 118 Lawlor dealt with periodic alimony payment modifications related to future salary increases, while this case deals with a request for lump sum alimony payments out of future trust distributions of principal. Hence, Lawlor is inapposite in this case and its holding must be limited to its unique circumstances.
The court concludes that no order contingent upon the plaintiff's future receipt of principal distributions from the trusts is appropriate.
Rather, the court considers the approach of a periodic alimony award suggested in Eslami v. Eslami, 218 Conn. 801
(1991), coupled with an assignment of property under46b-81 more appropriate in this case. The court has also considered the regularity and amounts of the previous trust distributions in fashioning the orders set forth below. A periodic alimony award may be modifiable upon a substantial change in the financial circumstances of the parties. As the Rubin court pointed out, and as reiterated in Eslami, supra, at pages 807-808, "Any prediction of what justice between the parties may require when a future event may occur is likely to be less well considered than a determination made after the event, when speculation as to the circumstance involved has been supplanted by actuality."
In light of the past history of a single, very large principal distribution to the plaintiff from each trust and the consistent distributions during the years 1985-1993, annual distributions in future years in greater amounts, or, large principal distributions, may very well be a substantial change in the parties' financial circumstances and constitute grounds to consider a motion to modify alimony.
Considering the foregoing findings, the court concludes that as the defendant is in need of support, and as periodic alimony is in the nature of support, the defendant's needs will best be met by an appropriate periodic alimony award, which will be within the plaintiff's capability to pay.
"Alimony is based upon the continuing duty of a divorced husband to support an abandoned wife and should be CT Page 3920 sufficient to provide her with the kind of living which she might have enjoyed but for the breach of the marriage contract by the defendant." Stoner v. Stoner, 163 Conn. 345, 354
(1972).
It is also important to note that the court permitted into evidence the appraised values of the two shopping center properties; the Groton property was valued in 1983 for $3.5 million; the Old Mystic property in 1986 for $5.85 million. The defendant called Jerome Silverstein, a certified real estate appraiser, who appraised these properties for the trusts and Mall in connection with the mortgage refinancings. He testified that the income approach he used to value the properties in 1983 and 1986 was appropriate then, and is appropriate now, with a slight modification in the capitalization rate.
The plaintiff's expert, Christopher Buckley, a certified real estate appraiser, testified that although the income approach remains proper for income producing properties of this kind, Silverstein's methodology was flawed. Buckley opined that Silverstein used only one year's cash flow, which was now inappropriate since the advent of computers, and the consequent greater ability to more easily predict and analyze the properties' future income and net cash flow. Buckley pointed out that in today's market and economy, a sophisticated potential buyer of such a property needed to examine all of the leases, and determine their expiration and renewal dates and terms and rentals, in order to more accurately project future cash flow, to more precisely value the property.
The court concludes that Buckley's opinion testimony is the more credible, and the court cannot accept the methodology suggested by the defendant, and extrapolate the 1983 and 1986 valuations of the properties to the present date, as such would be speculative. Besides, it is unnecessary to do so, in the view this court takes of the case.
The plaintiff's appraiser, Buckley, also opined that the Old Mystic shopping center was a prime property in a prime location, occupying the highest volume tourist area in this state, is adjacent to an interstate highway exit, and is unique. Neither appraiser testified to an opinion of either shopping center's present value. The gross and net taxable incomes from the properties for the past five years were CT Page 3921 admitted into evidence. These indicate that the centers have consistently provided income and now have substantial present value. The evidence also shows that the plaintiff received substantial income in his capacity as president of Mall, co-trustee of the MOIT trust, and as trust beneficiary for the years 1986-1993, almost without interruption.[14] From this evidence, the court infers that such sources and flow of income are reasonably assured to the plaintiff in the future; and the court has considered all of the evidence related to the assets and income of the trusts and Mall only in the determination of the property distribution made pursuant to General Statutes46b-81.
The court further finds that the plaintiff has overwhelmingly superior income and earnings, earning capacity, vocational skills and employability to that of the defendant; hence, he has a far greater opportunity than she has to acquire capital assets and income in the future.
The plaintiff has acknowledged in his testimony in regard to the defendant's employability that she `was never out there' and was `from the forties' It is clear that at her present age and state of health, she would be unable to acquire training, education or other skills required to become self-sufficient. At the same time, however, she ought to use reasonable diligence and attempt to obtain such skills and employment in order to fulfill the earning capacity she does have.
The court, in shaping its orders, must provide protection and some financial security for the defendant in the future, who because of her lack of more than minimal earning capacity, would be economically at risk. See Sweet v. Sweet,190 Conn. 657 (1983).
The court has considered all of the evidence and its findings in the light of the criteria in General Statutes46b-62, 46b-81 and 46b-82, and has also considered the federal and state tax implications and consequences of the financial awards, and orders:
A decree dissolving the marriage shall enter on the ground of its irretrievable breakdown.
The plaintiff shall convey to the defendant, by CT Page 3922 quitclaim deed, all his right, title and interest in and to the jointly owned family home known as No. 250 Mile Creek Road, Old Lyme, Connecticut, subject to the mortgage and other encumbrances thereon, which she shall pay and save him harmless therefrom.
The plaintiff shall pay to the defendant as periodic alimony, the sum of $1,300 per week.
He shall also pay, as additional periodic alimony, the defendant's health and medical insurance premiums for such coverage which shall be continued pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, (COBRA), and other applicable law. In the event the plaintiff's employment-related health insurance coverage does not provide for the defendant to elect a converted policy at the end of the statutory period, then the plaintiff shall pay for comparable health insurance coverage for the defendant as additional periodic alimony. In either case, such additional alimony shall be payable until she is eligible for Medicare or obtains employment providing health insurance, or until terminated as set forth below.
Said periodic alimony and additional periodic alimony payments shall be taxable income to the defendant and deductible by the plaintiff, and shall terminate upon the death of either party or the defendant's remarriage.
The plaintiff shall transfer to the defendant securities (which may include stocks bonds, mutual funds, retirement or IRA accounts) equal in value to the sum of $100,000 valued as of the date of this decree. The choice of which securities shall be the plaintiff's. If any transfer is required to be by Qualified Domestic Relations Order (QDRO), then the court shall retain jurisdiction over such order to ensure its compliance with applicable law relating to pension/retirement benefits.
The plaintiff shall maintain in good standing, and unimpaired, the Guardian Life Insurance Company policy number 321185, and designate the defendant as irrevocable beneficiary thereon, so long as he is obligated to pay alimony hereunder. He shall execute and deliver an authorization directed to said life insurance company for the benefit of the defendant, so that she may, from time to time, determine the CT Page 3923 good standing and status of said policy. In the event the plaintiff's employer fails to pay the premium, the plaintiff shall do so.
The plaintiff shall pay toward the defendant's counsel fees the sum of $25,000, which the court finds appropriate and reasonably necessary, within thirty days hereof. The court finds that a denial of counsel fees to the defendant would impair or undermine the other financial orders entered.
The defendant shall take, have and own, the following articles of personal property, free of any claims of the plaintiff: the 1990 Oldsmobile and 1981 Chevrolet motor vehicles; the household furniture and furnishings at 250 Mile Creek Road, Old Lyme, Connecticut (except as hereinafter set forth); her diamond ring, her bank accounts and SNETCO stock. She shall also pay all of the liabilities shown on her financial affidavit.
The plaintiff shall take, have and own the following real and personal property, free of any claims of the defendant: The Mall, Inc. stock; the parcels of unimproved real estate in Stonington and Waterford, Connecticut, subject to all encumbrances thereon, which he shall pay and save the defendant harmless therefrom; his 1962 and 1979 Corvette motor vehicles; the furniture and furnishings and personal effects now in his possession; the remaining securities shown on his financial affidavit dated January 26, 1994 after the transfer to the defendant above described; his bank accounts, the receivables from the trusts and Mall, Inc., and all his right, title and interest as beneficiary of said trusts.
The Olson family silverware (service for twelve) shall be distributed as follows: each shall have a service for six; the serving pieces shall be divided equally; if there are an odd number of pieces, the plaintiff shall have the additional piece. In the event of a dispute in the division of the serving pieces, the plaintiff shall have the first choice of one piece, then the defendant, and so on, until all of the pieces have been chosen.
All instruments of title and documents necessary or incidental to effectuate the orders entered herein shall be completed and exchanged by the parties within thirty days CT Page 3924 hereof.
The parties shall, on or before April 1, 1995 and annually thereafter, so long as the plaintiff is obligated to pay alimony to the defendant, exchange their W-2s, their 1099s, Schedule K-1s and such other documentation sufficient to show all income received by each party, from whatever source, including but not limited to, trust distributions, whether income or principal, capital gains, dividends, etc.
Teller, J.